UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

METROPOLITAN LIFE INSURANCE
    COMPANY,

                   Plaintiff,

                  **DECISION AND ORDER**
                   06-CV-444A

    v.

ANNE M. JACQUES and
CRAIG JACQUES,

                   Defendants.

---

**INTRODUCTION**

On July 6, 2006, plaintiff Metropolitan Life Insurance Company commenced this interpleader action by filing a complaint against defendants Anne M. Jacques ("Anne") and Craig Jacques ("Craig"). Plaintiff commenced this action to resolve which defendant was entitled to half of the proceeds of life insurance policies issued to decedent Steven D. Jacques ("Steven"). On September 1, 2009, this Court presided over a non-jury trial and received testimony and trial exhibits from the two interpleader defendants. After the trial, the Court gave defendants an opportunity to file proposed findings of fact and conclusions of law, which they filed on October 16 and 30, 2009. For the reasons below, the Court finds that Anne has established her entitlement to the proceeds in question by a preponderance of the evidence, and will direct payment of those proceeds to her.

**BACKGROUND AND FINDINGS OF FACT**

The following background information will constitute the Court's findings of fact pursuant to Rule 52(a) of the Federal Rules of Civil Procedure ("FRCP").

In 1986, according to Joint Exhibit 8 from the trial, Steven became an employee of Eastman Kodak Company ("Kodak"). Sometime thereafter, Steven became eligible to participate in two life insurance plans that Kodak administered. One of the plans was called the Kodak Life Insurance Plus Plan (the "Life Plan"); the other was called the Kodak Group Universal Life Insurance Plan (the "GUL Plan"). The Life Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), while the GUL Plan is governed by analogous New York law. Under the Life Plan, Steven's designated beneficiaries were eligible to receive benefits in the amount of $50,000. Under the GUL Plan, Steven's designated beneficiaries were eligible to receive benefits in the amount of $194,000. The money at issue in this case is an amount (the "Proceeds") equal to half of the benefits available under these two plans.

Extensive regulations and practices govern the administration of Steven's two life insurance plans, but the regulations and practices that are relevant to this case are those concerning how an employee may change designated beneficiaries. According to Joint Exhibit 6, Bates-numbered page MET 0132, Kodak instructed its employees that "[y]ou can name or change your beneficiary at any time without your beneficiary's consent by contacting Human Resources or

2

the Kodak Benefits Center for Basic and company-paid coverage and MetLife for Optional coverage and completing the proper forms . . . . When Kodak or MetLife receives notice of the change, it will take effect as of the date you signed the form, even if you die between the time you sign the form and the time it is received by Kodak or MetLife." Additionally, current Kodak benefits specialist Deirdre Irvine and retired Kodak benefits analyst James M. Georger testified at trial[1] regarding the procedure for changing a designated beneficiary. At all times relevant to this case, an employee who wanted to change designated beneficiaries would call the Kodak call center and speak to a representative about the proposed change. The representative would verify the employee's identity by asking for information including the employee's insurance number, date of birth, Social Security number, and address. The representative also would note whether a male or female voice was on the line. Theoretically, any male voice posing as a male employee and reciting the requested information could pass through the verification.

Once the call center representative verified the employee's identity, she would retrieve on her computer screen the employee's electronic benefits file.

---

[1] The Court finds that the testimony of these two witnesses generally was very credible and in agreement. To the extent that Ms. Irvine's testimony differed in any details from Mr. Georger's, the Court has given her testimony additional weight because she is a current employee and was the benefits specialist who processed the particular claim form at issue in this case. Ms. Irvine thus has a more specific recollection of how Kodak's computer system operated relative to Steven's benefits.

This file consisted of two screens or electronic pages. The first screen was the beneficiary information or "BBN" screen. This screen listed the life insurance plans in which the employee participated and the employee's current status with respect to those plans. The screen contained the effective date for the employee's plans. The BBN screen also had a listing of all of the employee's designated beneficiaries, with codes for each beneficiary's primary or contingent status and relationship to the employee. Finally, the BBN screen listed the effective date of the most recent update of designated beneficiaries.

The second screen in an employee's electronic file was the beneficiary designation or "BBF" screen. The BBF screen was a reverse chronological listing of any change in beneficiary designation that the employee ever made, with the effective date of each change. Each entry on the BBF screen also indicated which roll and which frame in Kodak's microfiche archives contained a scanned copy of the written change form that the employee had submitted.

When an employee called the Kodak call center and requested a change in designated beneficiaries, the call center representative would create a temporary third screen in the employee's electronic file, called a beneficiary pending or "BPN" screen. The BPN screen held the information that the employee provided by telephone regarding the proposed change. This information would remain unofficial and separated from the official information on the first two screens until confirmed through a written change form.

4

Although Ms. Levine hinted at rare occasions when changes in beneficiaries were completed entirely by telephone (see Trial Tr. at 61), official procedure at this point turned to written forms. Once an employee phoned in a requested change and a BPN screen stored the information, the call center representative would send the employee two copies of a written beneficiary change form along with an instruction sheet. The employee would be instructed to complete, sign, and date both copies of the change form and to mail them back to Kodak. Kodak then would take one copy and process it, meaning that a benefits specialist would use the form to confirm the proposed update entered previously in the temporary BPN screen. Upon confirmation of the update, the benefits specialist would enter a command that finalized the change. Finalizing the change was known as "releasing" the pending information to the first two screens. Upon release, the BPN screen disappeared entirely, and the information that was in it transferred over to the BBN and BBF screens as official beneficiary information. The processed form then was sent to a third-party company to be scanned into Kodak's microfiche archive and then destroyed.[2] Kodak did not retain original change forms. The other copy of the written form, now stamped as received and processed, was returned to the employee for his files.

---

[2]Both Ms. Irvine and Mr. Georger testified that, in their experience, a processed change form was lost in transit, from Kodak to the archiving company, perhaps once out of thousands of forms processed over the years.

Three features of the beneficiary change procedure noted above are important to the resolution of this case. First, although benefits specialists could update employee electronic files without having written change forms in front of them (i.e., the absence of a written form did not lock a benefits specialist out of an employee's electronic file), custom and practice required having a written form before finalizing any changes. Second, a call center representative never created a temporary BPN screen in an electronic file unless the employee called to request a change. Third, that temporary screen, once created, never disappeared unless a benefits specialist released the information to the first two screens in the electronic file.

This case centers around how many times Steven went through the change procedure noted above. The parties do not dispute that, as noted on page 2 of Joint Exhibit 1, Steven went through the procedure once in 1990. The 1990 change was not addressed at trial and is not relevant to any of the issues in the case.

The parties also do not dispute a second change that Steven made in 1992. When Stephen updated his beneficiary designations then, he was not married. He had a son, Brian Jacques ("Brian"), who was three years old at the time. Brian's mother is not a party to this case. Because Steven apparently did not want to name Brian's mother as a beneficiary, he named his brother Craig and Brian as beneficiaries who each would receive half of Steven's life insurance

6

benefits. The BBF screen from Steven's electronic file notes that the change form establishing Craig and Brian as co-equal beneficiaries appears at roll 239, frame 901 of Kodak's microfiche archives.

In 1994, Stephen married Anne. In 2004, Steven and Anne separated.[3] On February 26, 2005, Steven killed himself. On April 21, 2005, Anne submitted a life insurance claim form that was entered into evidence as Joint Exhibit 7.

Anne's submission of her life insurance claim form set in motion the events that led to the pending litigation. When Ms. Irvine received the claim form, she retrieved Steven's electronic file to compare the information on the claim form with the information in the system. At that point, Ms. Irvine noticed a problem. Although Anne's name appeared on Steven's BBN screen, the most recent change of beneficiaries that appeared on the BBF screen was the 1992 change that established Craig as a co-equal beneficiary with Brian. There was no third BPN screen. Ms. Irvine checked the archive rolls that were noted on the BBF screen but did not find any forms for Steven that mentioned Anne. Ms. Irvine also

---

[3] At trial, both Anne and Brian testified about numerous examples of dysfunction within the Jacques family over the years, either between Anne and Steven or between Anne and Brian. The Court found the testimony of Anne and Brian credible with respect to major events in this case and to establishing, in general, an unfortunate amount of discord in the Jacques family. That said, the Court has rejected all testimony about specific instances of family events and about Anne's description, for the first time at trial, of personally witnessing the signing of a change of beneficiary form. Given the amount of family discord that became apparent at trial, this testimony was too motivated by personal animosity to be credible.

noticed that, according to the BBN screen in Steven's electronic file, the change in beneficiaries that replaced Craig with Anne occurred on July 13, 1995. Accordingly, Ms. Irvine conducted a search of all archived forms for all employees from the year 1995, just in case any change form submitted in 1995 was in the archives and simply not noted on Steven's BBF screen. Ms. Irvine found no change form in the 1995 archives pertaining to Steven.

Unable to resolve the discrepancy in Steven's electronic file, plaintiff took steps to inform defendants that a dispute arose regarding the entitlement to the Proceeds.[4] Plaintiff asked defendants to determine whether they could resolve the dispute among themselves, or whether interpleader litigation would be necessary. By correspondence dated May 1, 2006, Craig informed plaintiff that he and Anne could not reach an agreement about the Proceeds. Plaintiff subsequently commenced this action on July 6, 2006. Through filings dated July 10 and 31, 2006, both Anne and Craig waived service of process. By stipulation filed on September 25, 2006 and approved by the Court on September 26, 2006, plaintiff deposited the Proceeds with the Clerk of the Court and subsequently was dismissed from the case with prejudice.

As the factual background above makes apparent, the difficulty of this case is that it cannot be resolved on direct evidence alone. Of the people who have

---

[4]The parties never have disputed Brian's entitlement to half of the life insurance benefits.

been involved in this case and who testified at trial, no one knows why Steven's BBN screen lists Anne as a beneficiary as of July 1995 while his BBF screen lists no changes after the 1992 change involving Craig. There is no reliable direct evidence that Steven called Kodak at any time, let alone in 1995, to replace Craig with Anne. Similarly, there is no reliable direct evidence that Steven ever submitted a written change form after 1992. Without reliable direct evidence, the Court will have to resolve this case by assessing the competing inferences that defendants have asked it to make.

Among other proposed findings of fact and conclusions of law, Anne asks the Court to give particular consideration to Kodak's practices when finalizing changes to designated beneficiaries. Anne emphasizes that, with perhaps rare exceptions, Kodak does not release information from any BPN screen unless it has received a signed and completed change form that confirms the proposed change. Also, Anne points out that information does not appear on the BBN screen unless it has been released from the BPN screen. In that context, and given that Anne appears in Steven's BBN screen and that there is no BPN screen in Steven's electronic file, Anne asks the Court to infer that Steven called Kodak to request a change in 1995, approximately a year after he married her, and that he did submit a signed and completed change form sometime thereafter. As a corollary, Anne asks the Court to infer that the discrepancy in Steven's electronic file arose because someone at Kodak or at the third-party scanning company lost

9

the form or otherwise failed to archive it after it was processed. In the alternative, Anne contends that the Court has enough circumstantial evidence to infer that Steven at least initiated a change of beneficiaries and substantially complied with Kodak's policies, even if it should conclude that Kodak never received a completed change form.

In contrast, Craig asks the Court to give particular consideration to the complete absence of any direct evidence that Steven ever called Kodak or submitted a written change form. Craig emphasizes that this case differs from others in which a form was submitted but not filled out properly, or in which at least one objective and credible witness distinctly remembered handling a completed form that later was lost. Craig emphasizes further that written changes almost never were lost after processing, implying that the probability here of a form arriving and then being lost is low. From there, Craig asks the Court to consider Kodak's procedure stating that no change in beneficiaries was considered official without receipt of a completed change form. As a corollary, Craig asks the Court to infer that the BBN screen in Steven's electronic file looks the way that it does now because of one or more unspecified administrative errors. Craig suggests that the evidence that Steven submitted a completed change form is so lacking that inferring an error in the BBN screen is more reasonable than inferring that Kodak possessed a completed change form at some point.

## DISCUSSION AND CONCLUSIONS OF LAW

### *Interpleader Jurisdiction*

As a preliminary matter, this Court has jurisdiction to resolve entitlement to the Proceeds. As stated in the complaint, plaintiff commenced this case under FRCP 22. In a rule interpleader case, as opposed to a statutory interpleader case under 28 U.S.C. § 1335, a federal question confers subject-matter jurisdiction even if the diversity of citizenship required by Section 1335 does not exist. *See Metro. Life Ins. Co. v. Bigelow*, 283 F.3d 436, 440 (2d Cir. 2002) (holding, in an interpleader case concerning insurance proceeds governed by ERISA, that "federal subject matter jurisdiction exists under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331") (citations omitted); *Gelfgren v. Republic Nat. Life Ins. Co.*, 680 F.2d 79, 81 (9th Cir. 1982) ("Unlike statutory interpleader, 28 U.S.C. § 1335, in which jurisdiction is based solely on diversity of citizenship, jurisdiction in interpleader under [FRCP 22] can be based on a claim arising under federal question jurisdiction.") (citations omitted). Here, part of the Proceeds comes from the Life Plan, which is governed by ERISA.[5] Even though there is no diversity of citizenship at all between plaintiff and defendants, the relationship between the Life Plan and ERISA displaces the diversity requirement and suffices on its own to give this Court jurisdiction.

---

[5]To the extent necessary, the Court asserts jurisdiction over the portion of the Proceeds coming from the GUL Plan pursuant to 28 U.S.C. § 1367(a).

### *Burden of Proof in Interpleader Actions*

"In an interpleader action, each claimant must succeed in establishing his right to the property by a preponderance of the evidence." *Midland Ins. Co. v. Friedgood*, 577 F. Supp. 1407, 1411 (S.D.N.Y. 1984) (citations omitted). In this case, the parties do not dispute Craig's entitlement to the Proceeds as of 1992. Accordingly, a preponderance of the evidence establishing a successful claim to the Proceeds will have to address whether Steven made any changes in designated beneficiaries after 1992.

"As a general rule, under Pennsylvania, Delaware and New York law, the method prescribed by the insurance contract must be followed in order to effect a change of beneficiary." *McCarthy v. Aetna Life Ins. Co.*, 704 N.E.2d 557, 560 (N.Y. 1998) (citations omitted). That said, "an insurer waives strict compliance with the policy provisions by bringing an action in interpleader. But interpleader does not waive the requirement that a change of beneficiary be in at least substantial compliance with the terms of the policy." *William Penn Life Ins. Co. of New York v. Viscuso*, 569 F. Supp. 2d 355, 365 (S.D.N.Y. 2008) (citations omitted). Substantial compliance when changing a designated beneficiary means that "[t]here must be an act or acts designed for the purpose of making the change, though they may fall short of accomplishing it." *McCarthy*, 704 N.E.2d at 560 (citations omitted).

### *Competing Inferences*

This case presents the Court, as finder of fact, with an unusual challenge. In most interpleader cases, the finders of fact must sort through specific acts taken by the decedent—unsigned, undated, or otherwise incomplete change forms; ambiguous instructions; telephone calls or written correspondence; etc.—to determine whether those acts, alone or in combination, established substantial compliance. *See generally, e.g., Aetna Life Ins. Co. v. Wise*, 184 F.3d 660 (7th Cir. 1999) (finding substantial compliance after reviewing an incomplete life insurance enrollment form and a suicide note specifying who would receive the life insurance proceeds); *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554 (4th Cir. 1994) (finding substantial compliance after reviewing documents and testimony about the decedent's direct instructions to his insurer to change beneficiaries). Put another way, most interpleader cases require finders of fact to review the beginning and the middle of the story of a decedent's interaction with his insurer to determine the end result, and whether that end result constitutes substantial compliance. In contrast, this case presents the opposite situation. The Court here has only the end of the story—an entry in Steven's electronic file that normally occurs after acts constituting strict compliance, not just substantial compliance. From there, the Court must resort to inferences to decide whether those preceding acts occurred.

13

In the face of the challenge to fill in a story based on what happened at the very end, the Court finds two evidentiary principles particularly helpful. The first is the general principle that a fact finder "may make common-sense inferences from the proven facts in both civil and criminal cases." *U.S. v. Hines*, 256 F.2d 561, 564 (2d Cir. 1958) (citations omitted). As a district court in this circuit explained years ago in an accident case, "Fact finding does not require mathematical certainty and fact finders are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly [be] drawn. Inference is never certainty, but it may be plain enough to justify a finding of fact." *Universe Tankships, Inc v. Pyrate Tank Cleaners, Inc.*, 152 F. Supp. 903, 921–22 (S.D.N.Y. 1957) (internal quotation marks and citations omitted). Here, defendants do not dispute that Steven's electronic file looks the way it looks in Joint Exhibit 1. The parties do not dispute that, as noted on Steven's BBN screen, the substitution of Anne for Craig occurred in July 1995. A common-sense assessment of all of the evidence produced at trial suggests that only three scenarios could explain why Steven's BBN screen looks that way.

In the first scenario, person or persons unknown impersonated Steven on the telephone to initiate a change, and then either forged Steven's signature on a written change form that subsequently was lost, or persuaded someone at Kodak

14

to accept final verbal instructions in lieu of a written form. This scenario would require the Court to assume that at least one person 1) knew that Steven worked at Kodak; 2) knew that he had life insurance policies at Kodak; 3) knew in 1995 that he married Anne a year before and had not yet made her a beneficiary; 4) knew that Craig was a beneficiary; 5) had motive in 1995[6] both to add Anne as a beneficiary and specifically to remove Craig; 6) had both a male voice and the personal information necessary to slip through Kodak's verification process; 7) convinced Kodak to send written change forms to an address that it would have noticed was not Steven's, or, alternatively, stole Steven's mail when the forms arrived at his address; and 8) forged Steven's signature. Counsel for Craig hinted at this scenario, or something like it, at trial when he emphasized Anne's 2005 forgery charges during her cross-examination. Craig never proposed, however, who was in Steven's life in 1995 who would have been in such a position to fulfill this scenario. Consequently, the Court rejects this scenario as without factual foundation.

In the second scenario that would explain the current state of Steven's electronic file, Steven himself initiated the change process by contacting the Kodak call center. Steven then failed to follow through either with final verbal instructions or with a completed change form. Sometime after the initial change

---

[6]The timing of the change of beneficiaries in Steven's electronic file, which the parties again do not dispute, makes Anne's forgery charges 10 years later irrelevant.

15

request, someone at Kodak would have released the proposed change from Steven's BPN screen by mistake. This scenario reduces the number of inferences or assumptions that the Court would have to make compared to the first scenario, but leaves one critical question unanswered. This scenario fails to explain how Kodak would have known to retrieve Steven's electronic file in July 1995 to release its pending information. Kodak is a large corporation that probably has thousands, if not tens of thousands, of employees worldwide. Kodak's computer system probably maintains countless thousands of electronic employee files that keep track of every employee's life insurance benefits. With so many electronic files to maintain for so many employees, Kodak would have had no reason to retrieve any one employee's electronic file to finalize a beneficiary change unless prompted to do so. The Court thus rejects this second scenario and its suggestion that the finalization of any beneficiary changes noted in Steven's BBN screen occurred by mistake.

In the third scenario that would explain the current status of Steven's electronic file, Steven initiated a change by telephone. Steven later submitted a written change form that was received and processed, but somehow lost after processing. This scenario eliminates the need to make any unfounded assumptions about people impersonating Steven on the telephone. This scenario further eliminates the difficulty of explaining that someone at Kodak would have retrieved Steven's electronic file, among all others, and finalized any pending

information in there for no particular reason.  Finally, this scenario fits Kodak's procedure and practice that, with rare exceptions, beneficiary information simply does not reach the BBN screen without a telephone call and a written change form from the employee in question.  Given that the Court cannot resolve this case without making some set of inferences from the facts presented at trial, the Court hereby adopts this third scenario as the beginning and middle story that most likely led to the undisputed end result that appears in Joint Exhibit 1.

The second evidentiary principle on which the Court has relied—*res ipsa loquitur*—further supports the Court's inference that a satisfactory written change form existed at some point.  "The *res ipsa* doctrine permits, but does not require, an inference of negligence without direct proof of specific negligent acts or omissions by the accused."  *Point-Du-Jour v. Am. Airlines*, No. 07-CV-3371, 2009 WL 3756627, at *5 (E.D.N.Y. Nov. 5, 2009) (citations omitted).  Adapted from its origins in tort law, the doctrine of *res ipsa loquitur* permits this Court to infer that a completed change form existed because 1) Anne's appearance in Steven's BBN screen is an event that normally does not occur without the receipt and processing of a written change form; 2) her appearance resulted from commands entered by Kodak into a computer system entirely within Kodak's control; and 3) those commands were entered without any voluntary action or contribution on Anne's part.  *Cf. Stone v. Courtyard Mgmt. Corp.*, 353 F.3d 155, 157 (2d Cir. 2003) (summarizing the *res ipsa loquitur* doctrine in its original context).

This type of analysis was used once before in an interpleader case whose facts were essentially identical to the facts of this case. In *Prudential Insurance Co. of America v. Lehman*, No. 99 C 4304, 2001 WL 138922 (N.D. Ill. Feb. 16, 2001), a decedent purchased life insurance coverage in 1984, and named his then-first wife as a Class 1 beneficiary and their three children as Class 2 beneficiaries. In 1988, the decedent divorced. In July 1989, the decedent married his second wife. The insurance company's computer records reflected that on or about January 12, 1993, the Class 1 beneficiary under the policy was changed from the first wife to the second wife even though the insurance company was "unable to locate the ultimately processed written form that triggered that beneficiary change." *Id.* at *2. The decedent was divorced from his second wife in 1996 and died in 1999. After the decedent's death, the two ex-wives submitted rival claims to the insurance company, each claiming to be the primary beneficiary under the decedent's coverage. Similar to Craig in this case, the first ex-wife in *Lehman* argued in subsequent interpleader litigation that the decedent's file at the insurance company did not indicate receipt of a written request for change of beneficiary, and that "the change of beneficiary that appears in the computer records was erroneously entered into the system." *Id.* at *3. Similar to Anne, the second ex-wife in *Lehman* argued that the insurance company's "computer records would not reflect a change in beneficiary unless it had first received a written request for that change signed by [the decedent].

18

Because those computer records specifically show [her] as the Class 1 beneficiary . . . [the decedent] must have submitted the required form." *Id.* The court ruled in favor of the second ex-wife, holding that the insurance company's

> failure to turn up the Change of Beneficiary form in its records cannot obscure the only reasonable inference from the record that [it] *did* provide: that [the decedent] had indeed requested a change of beneficiary in a manner satisfactory to [it]. Any other purported explanation really defies reason, for the record here provides a classic res ipsa loquitur scenario. Is it to be imagined that [it] (or any other major insurer) goes about changing beneficiaries under its life insurance policies on its own? And pray tell, from what source could [it] conceivably have derived [the second ex-wife's] name to begin with, if not from [the decedent]? Any such fanciful notion is belied not only by [the insurance company's] ultimate computer entry but by the attached photocopy of [its] printed form used for beneficiary designations, with the information underlying the computer entry filled in by typewriter. Thus [the] assertion that the change of beneficiary that is expressly reflected by [the insurance company's] records had been "erroneously entered"—if that assertion is intended to say (as [the first ex-wife] would have it) that the change had not emanated from [the decedent's] request for that change to be made—is so bizarre as to call for its outright rejection.

*Id.* at *4.

In choosing to infer that a completed written change form existed at some point in this case, the Court adopts the analysis from *Lehman* as persuasive. Although the Court did hear testimony at trial that Kodak has changed designated beneficiaries in the past without a completed written change form in hand, the Court infers from all of the evidence in this case that such occasions occur so infrequently that they can be disregarded. For all practical purposes, Steven's BBN screen simply would not have assumed its current appearance without

19

some prompting from Steven himself that Kodak found satisfactory. Any other explanation for the current status of Steven's BBN screen would take the Court down a path of increasing speculation and paranoia.

## CONCLUSION

For all of the foregoing reasons, the Court hereby finds that Anne has established her claim to the Proceeds by a preponderance of the evidence, and that her claim supersedes the claim that Craig had as of 1992. The Clerk of the Court is directed to take the steps necessary to deliver the Proceeds, deposited with the Court by plaintiff, to Anne. All parties shall bear their own costs. Upon delivery of the Proceeds to Anne, the Clerk of the Court shall close this case.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED: December 10, 2009